IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **ILLINOIS-AMERICAN WATER COMPANY,** | MDL No. 2:18-mn-2873-RMG |
| **Plaintiff,** | This Document Relates To: |
| **v.** | **Case No. 2:20-cv-1837-RMG** |
| **THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC. (F/K/A DOWDUPONT, INC.); CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DYNEON LLC; KIDDE-FENWAL, INC.; ANGUS FIRE; THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; BUCKEYE FIRE PROTECTION COMPANY; CHEMGUARD, INC.; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS LP; JOHN DOE DEFENDANTS 1-50,** | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Illinois-American Water Company ("ILAW" or "Plaintiff") files this Complaint against the Defendants named herein and in support thereof alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action for damages, contribution and reimbursement of costs incurred, to be incurred, and which will continue to be incurred, to address the presence of Polyfluoroalkyl substances or "PFAS" chemicals—including but not limited to Perfluorooctanoic

1

acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorohexanoic acid ("PFHxA"), Perfluoropentanoic acid ("PFPA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA"), Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS"), as well as any and all hazardous chemicals produced by Defendants (collectively referred to herein as "PFAS"), — found in the public water supply systems owned and operated by Plaintiff throughout the State of Illinois and in the water that serves as supply sources for those systems. As the manufacturers and sellers of products that contain PFAS compounds, Defendants The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E.I. DuPont de Nemours and Company, DuPont de Nemours, Inc. (f/k/a DowDuPont), Corteva, Inc., The Chemours Company, The Chemours Company FC, LLC, Dyneon LLC, Kidde-Fenwal, Inc., Angus Fire, The Ansul Company, Buckeye Fire Equipment Co., Buckeye Fire Protection Company, Chemguard, Inc., National Foam, Inc., Tyco Fire Products, LP, and John Doe Defendants 1-50 (collectively "Defendants"), have discharged PFAS into, or are otherwise responsible for PFAS released into, the waters that serve as the supply sources for Plaintiff's public water supply systems.

2.      For years, Defendants manufactured, sold, and distributed PFAS compounds and products containing PFAS chemicals.  These products include the firefighting suppressant agent, Aqueous Film Forming Foam ("AFFF") that contains those compounds, for use at airports and military facilities throughout the State of Illinois.

3.      Defendants knew, or should have known, that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment and of the dangers associated with these compounds.  Yet, Defendants handled, discharged and were

otherwise responsible for the release of PFAS into the environment without sufficient containment or caution.  Defendants' acts and omissions resulted in the presence of these compounds in the water sources of Plaintiff's public supply systems.  As a result of the occurrence of PFAS in the environment from Defendants' discharges, Plaintiff will continue to incur costs for ongoing sampling, monitoring, and capital improvements that may be deemed necessary to reduce and/or remove PFAS contamination.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under federal diversity, pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount-in-controversy exceeds $75,000.

5.     Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873.  Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25-29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72).  Plaintiff designates the United States District Court for the Central District of Illinois as its "Home Venue" under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in that District.  But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

## PLAINTIFF

6.     Plaintiff is an Illinois corporation with its principal place of business at 300 North Water Works Drive, Belleville, Illinois  62233.  Plaintiff, which provides water and wastewater services to an estimated 335,000 Illinois customer connections, is a direct, wholly owned

subsidiary of American Water Works Company, Inc., the largest publicly traded water and wastewater utility company in the United States.

7.      Plaintiff owns and operates public water supply systems in the State of Illinois.

8.      Plaintiff relies on groundwater aquifers and surface waters to supply water for its public water systems.

## DEFENDANTS

9.      Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation, with its principal place of business located at 3M Center, St. Paul, Minnesota 55133.

10.     Through at least 2002, 3M manufactured PFOS for use in AFFF and other products, and it manufactured AFFF that contained PFAS compounds.

11.     Defendant Dyneon LLC ("Dyneon") is a subsidiary of 3M and is a Delaware corporation with its principal place of business in Oakdale, Minnesota.  Dyneon does business throughout the United States, including in Illinois, and in various other countries.  At all relevant times, Dyneon manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at various military bases,  airports, and other locations throughout the United States.

12.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  DuPont does  business throughout the United States, including in Illinois. DuPont manufactured, marketed, promoted, distributed, and/or sold products containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS, that were used, inter alia, in AFFF. Specifically, DuPont was a founding member

of the Fire Fighting Foam Coalition and through its active participation in this Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers.

13.     Defendants The Chemours Company and The Chemours Company FC, LLC are Delaware corporations with their principal places of business in Wilmington, Delaware. These Defendants are collectively referred to as "Chemours" or "the Chemours Defendants" and do business throughout the United States, including in Illinois. In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and the Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April of 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA/PFOS. DuPont and Chemours, as alleged in detail below fraudulently conveyed the assets and liabilities of DuPont in this spin-off. Chemours has filed a complaint against DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities.

14.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva does business throughout the United States, including in Illinois. Corteva was formed through a series of transactions initiated by the merger of DuPont and the Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont.

Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale.

15.     Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. New DuPont does business in the United States, including in Illinois. DowDuPont became New DuPont following the Corteva spin-off. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spin-offs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale.

16.     Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants."

17.     Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, North Carolina 27501.

18.     At all times relevant, Angus manufactured fire suppression products, including AFFF that contained PFAS compounds.

19.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

20.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFAS compounds.  Ansul had a fire-fighting foam product named

TARGET-7. Ansul initially used fluorosurfactant from Ciba-Geigy (Lodyne S-112) for Ansul's fluoro-telomerization process to manufacture AFFF. Ansul's foam was known as Ansulite or AnsulAFFF. Ansulite 3x3 was marketed as the first alcohol-resistant AFFF capable of being used on both hydrocarbon and polar solvent fuels at a 3% concentration. Additional suppliers of fluorosurfactants to Tyco/Ansul include Dynax, Chemguard, and Atochem. Tyco/Ansul's AFFF does not contain perfluorooctane sulfonate ("PFOS") due to their telomerization process but did contain perfluorooctanoic acid ("PFOA"). Ansul's AFFF products were first sold to the U.S. Government in 1976.

21.     Defendants Buckeye Fire Equipment Company and Buckeye Fire Protection Company (collectively "Buckeye") are North Carolina corporations, with their principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

22.     At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFAS compounds.

23.     Chemguard, Inc. (referred to herein as "Chemguard") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

24.     Tyco Fire Products, L.P. ("Tyco Fire") is a limited partnership with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

25.     At all times relevant, Chemguard and Tyco Fire manufactured fire suppression products, including AFFF that contained PFAS compounds.

26.     Chemguard makes both 3% and 6 fluorotelomer-based AFFF. Chemguard's AFFF was first sold to the U.S. Government in 1998.  Chemguard also manufactured and sold its own fluorosurfactants to other AFFF manufacturers, including Defendant National Foam, Inc. Chemguard purchased other fluorosurfactants from Ciba-Geigy (Lodyne), Dynax, Chemours

(Capstone), and Atochem n/k/a Archema.

27.    National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, with its principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

28.    At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds.

29.    Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Illinois. Kidde manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

30.    Upon information and belief, Defendants John Does 1-50 also manufactured and sold products that contain PFAS compounds.  Plaintiff presently lacks information sufficient to specifically identify the names of Defendants sued herein under the fictitious names DOES 1 through 50.  Plaintiff will amend this Complaint to show their true names if and when they are ascertained.

## POLYFLUOROALKYL SUBSTANCES

31.    PFAS compounds are a family of manmade chemicals, also known as perfluorochemicals ("PFCs"), which have been used for decades to make products that resist heat, oil, stains, grease and water.

32.     In the 1940s and 1950s, 3M began creating PFAS chemicals and incorporating them into their products after recognizing their surfactant properties.  Over the years, PFAS chemicals were sold to other companies for use in AFFF and a variety of other products, including stain resistant carpeting and upholstery, clothing, paper packaging for food, water and grease resistant cookware.

33.     AFFF was introduced commercially in the mid-1960s and rapidly became the primary fire-fighting foam in the United States and other parts of the world. AFFF is a Class-B firefighting foam, which is water-based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

34.     AFFF's are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel. It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam.

35.     PFASs are extremely persistent in the environment and resistant to typical environmental degradation processes.  In addition, they are thermally stable synthetic organic contaminants, are likely carcinogenic, and have been shown to correlate with thyroid disease and immune deficiencies. PFASs also have high water solubility (mobility) and low biodegradation (persistence).

36.     PFASs, in particular PFOS and PFOA, have been identified as "emerging contaminants" by the United States Environmental Protection Agency ("EPA").  This term describes contaminants about which the scientific community, regulatory agencies and the general public have a new and increasing awareness or understanding about how they move in

9

the environment or affect public health.

37.     PFAS, like other emerging contaminants, have become the focus of active research and study, which means that new information is released periodically regarding the effects on the environment and human health as a result of exposure to the chemicals.

38.     Certain PFAS compounds, such as perfluorooctane sulfonate ("PFOS") and PFOA (which is also known as "C8" because it contains eight carbon compounds), have been the focus of the Illinois Environmental Protection Agency ("IEPA") and EPA's investigations.

39.     United States EPA studies have indicated that exposure to PFOA and PFOS over certain levels can result in adverse health effects, including but not limited to developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).

40.     In January of 2009, the EPA established a drinking water Provisional Health Advisory Level ("HAL") for PFOA and PFOS, the two PFAS compounds about which it had the most toxicological data. EPA set the Provisional HAL at 0.4 parts per billion (ppb) for PFOA and 0.2 ppb for PFOS.

41.     In May 2016, EPA issued new HALs for PFOA and PFOS, identifying 0.07 ppb (or 70 parts per trillion (ppt)) as the concentration of PFOA or PFOS in drinking water.

42.     In its most recent Annual Groundwater and Drinking Water Program Review, issued December 2019 and covering the calendar year 2018, the IEPA reported that it was working on a PFAS strategy, with one of its first steps being to "determine the statistical

prevalence of 18 PFAS contaminants in 118 community water supply wells and 32 surface intakes."[1]

43.    Additionally, in January of 2020, the IEPA proposed draft amendments to the Illinois Class I and Class II groundwater standards to establish a health-based Maximum Contaminant Level ("MCL") limits for PFAS.  The proposed standards for individual PFAS constituents are as follows:

| Constituent | Standard (mg/L) |
|---|---|
| Perfluorobutane Sulfonic Acid (PFBS) | 0.14 |
| Perfluorohexane Sulfonic Acid (PFHxS) | 0.00014 |
| Perfluorononanoic Acid (PFNA) | 0.000021 |
| Perfluorooctanoic   Acid (PFOA) | 0.000021 |
| Perfluorooctane  Sulfonic Acid (PFOS) | 0.000014 |

44.    ILEPA has also proposed a combined PFOA and PFOS standard of 0.000021. Likewise, in issuing its 2016 HALs, EPA directed that when both PFOA and PFOS are found in drinking water, the *combined* concentrations of PFOA and PFOS should be compared with 70 ppt health advisory level.

45.    Following public comment, the proposed standards will be submitted to the Illinois Pollution Control Board for further comment and promulgation of a final rule.

---

https://www2.illinois.gov/epa/Documents/iepa/compliance-enforcement/drinking-water/2019_Groundwater_Drinking_Water_Program_Review_CY18_Report_Final.pdf, at  37.[2]  For  instance, various of The Chemours Company's and Dupont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

46.     In connection with its emerging contaminant studies, EPA implemented an Unregulated Contaminant Monitoring Rule Number 3 in 2012 ("UCMR 3"), which was designed to collect nationwide information regarding the occurrence of PFAS contamination in the public's water supply.

47.     UCMR 3 required sampling of Public Water Systems ("PWSs") serving more than 10,000 people (i.e., large systems) and 800 representative PWSs serving 10,000 or fewer people (i.e., small systems) for 21 chemicals, including a number of PFASs, during one consecutive twelve month period in the timeframe between 2013 through 2015.

48.     In 2015, Plaintiff participated in the UCMR 3 sampling for its facilities that serve more than 10,000 people.

49.     The results of the UCMR 3 sampling by others revealed the presence of PFAS compounds in groundwater at various locations throughout Illinois.

50.     More recent testing has detected the presence of PFAS compounds in source water at various locations throughout Illinois.

51.     Sampling under UCMR 3 used higher reporting limits than would be applicable in light of scientific information and guidance levels developed since that time, which are much lower than those employed in 2008 and 2009.

52.     In addition, the UCMR 3 sampling effort did not combine PFAS levels, thus not taking into account added effects from the presence of more than one PFAS compound as EPA has recognized is appropriate.

53.     While more studies have been conducted, and thus, more is known regarding PFOS and PFOA, all PFAS compounds have generally demonstrated similar characteristics to PFOS and PFOA.

12

54.    Although some PFAS compounds have been shown to break down, the resulting products typically end at non-biodegradable PFOA and PFOS.

55.    The EPA acknowledges that the studies associated with PFAS compounds are ongoing, and as such, the HALs may be adjusted based upon new information.  In EPA's February, 2020, PFAS Action Plan:  Program Update, the agency included information on a newly approved laboratory method – Drinking Water Method 533 – for testing and detecting PFAS in drinking water.  This new method will allow for more effective measurement of PFAS in drinking water.  EPA also announced that it plans to provide for further monitoring of PFAS in the next UCMR sampling cycle.

56.    Additionally, in a significant step to tighten the federal health-based standards, In February, 2020, the EPA announced it was gathering the information on PFOA, PFOS and other PFAS substances necessary to begin the process of establishing a national primary drinking water regulation for PFOA and PFOS.

57.    As manufacturers, sellers, handlers and dischargers of PFAS compounds, and products containing PFAS, Defendants knew or should have known that the inclusion of PFAS chemicals in any products presented an unreasonable risk to human health and the environment.

58.    Defendants knew or should have known that PFAS compounds are highly soluble in water, highly mobile, extremely persistent, and highly likely to contaminate water supplies if released to the environment.

59.    Defendants' prior knowledge of the adverse impacts from PFAS compounds to human health and the environment amounts to reckless disregard to human health and environmental safety.  Nonetheless, Defendants negligently and recklessly manufactured and

sold PFAS and products containing PFAS with no warnings or instructions on use or disposal to avoid contamination.

60.     Defendants' actions have directly resulted in contamination of certain wells that make up Plaintiff's water supply system.  Because Defendants' PFAS has infiltrated the waters that serve as the source for Plaintiff's public water supply system, contamination of Plaintiff's wells is recurring and continuing.

## ILLEGAL TRANSFERS BETWEEN THE DUPONT DEFENDANTS

61.     In approximately 2014, DuPont formed Chemours as a wholly-owned subsidiary. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

62.     In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included at least titanium technologies, fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

63.     In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.[2]

64.     The DuPont-Chemours transfer included incredible amounts of debt and

---

[2] For instance, various of The Chemours Company's and Dupont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

65.    At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

66.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

67.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

68.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

69.    At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

70.    Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours board were appointed. The spin-off and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

71.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

72.    Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFCs.

73.    In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

74.    Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the

Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

75.    At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

76.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including for the claims that arise out of this case, which has and will further harm Plaintiff.

## PLAINTIFF'S WATER SYSTEM IMPROVEMENTS

77.    Plaintiff is committed to the supply of potable drinking water consistent with federal and state guidelines and requirements.  Plaintiff must therefore implement remedies to assure that the water it supplies to its customers meets these standards.

78.    As a direct result of Defendants' action, Plaintiff has had to make plans to address PFAS contamination.  In doing so, Plaintiff has conducted and continues to conduct sampling,

studies and investigations related to PFAS, which requires funding by Plaintiff, including costs for its personnel to supervise the assessments, and costs to develop PFAS treatment scenarios, and costs to analyze available alternatives.

79.    Plaintiff will continue to incur costs for ongoing sampling, monitoring, and capital improvements that may be deemed necessary to reduce and/or remove PFAS contamination.  Operation and maintenance measures for any such improvements will be required and will add further to the costs Plaintiff has incurred and will incur to address Defendants' PFAS contamination.

## **CAUSES OF ACTION**

## **COUNT ONE – STRICT LIABILITY (ABNORMALLY DANGEROUS ACTIVITY) AGAINST ALL DEFENDANTS**

80.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

81.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

82.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

83.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

84.    By causing PFAS contamination and the resulting impact to Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity for which they are strictly liable.

85.    As a result of Defendants' abnormally dangerous activities, Plaintiff has incurred, and will continue to incur costs and damages, such as investigation, cleanup, remediation, or removal costs related to PFAS contamination.

## COUNT TWO – STRICT LIABILITY (FAILURE TO WARN) AGAINST ALL DEFENDANTS

86.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

87.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the source for Plaintiff's public water supply systems, thereby causing damage to Plaintiff.

88.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

89.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

90.    Defendants failed to provide warnings or instructions sufficient to notify the users of the dangers inherent in their products.

91.    Defendants' failure to provide notice or instruction regarding the dangers to human health and the environment rendered Defendants' PFAS and PFAS-containing products unreasonably dangerous for the purposes intended and promoted by Defendants.

92.    This failure to warn or adequately instruct regarding the dangers associated with use of these products directly and proximately caused harm to Plaintiff.

## COUNT THREE – STRICT LIABILITY (DESIGN DEFECT) AGAINST ALL DEFENDANTS

93.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

94.    Defendants herein, at all times relevant, were in the business of the design, manufacture, sale and distribution of PFAS and PFAS-containing products.

95.    Defendants designed, manufactured, marketed, and sold defective products that were unreasonably dangerous for their intended use.

96.    When Defendants placed PFAS and their PFAS-containing products into the stream of commerce, the products were defective, unreasonably dangerous, and not fit, suitable or safe for the intended, foreseeable and ordinary uses.

97.    The products designed, manufactured, sold and distributed by Defendants reached consumers and users without substantial change to the condition and nature of the products.

98.    Defendants, with knowledge of the risks associated with the use of PFAS compounds, failed to use reasonable care in the design of PFASs.

99.    The defects in Defendants' products existed at the time the product left Defendants' control and were known to Defendants.

100.    Reasonable safer alternatives exist and were available to Defendants at all relevant times.  Thus, the risks of Defendants' products outweighed the benefits.

101.    The defects in Defendants' products proximately caused and have directly resulted in the damages of which Plaintiff complains.

**COUNT FOUR – NEGLIGENCE**
**AGAINST ALL DEFENDANTS**

102.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

103.    Defendants had a duty to exercise due or reasonable care in the manufacture, distribution, and use of its PFAS chemicals and PFAS-containing products so as to avoid harm to those who would be foreseeably injured by PFAS environmental contamination.

104.    Defendants knew or should have known that their PFAS products would result in the release, discharge, or disposal of PFAS compounds into the environment that would lead to contamination of drinking water supplies and hazards to human health if not treated.

105.    By failing to exercise due care in the design, manufacturing, marketing, and sale of PFAS and their PFAS-containing products, Defendants breached their duty to avoid harm to Plaintiff.

106.    As a result of Defendants' negligence, Plaintiff has incurred, and will continue to incur costs and damages, such as investigation, cleanup, remediation, or removal costs related to PFAS contamination.

107.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiff.

108.   As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages.

## COUNT FIVE – PRIVATE NUISANCE
## AGAINST ALL DEFENDANTS

109.   Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

110.   Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded, unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water supply systems and the water sources that supply those systems.

111.   The private nuisance created by Defendants is continuing.

112.   Defendants have failed, and continue to fail, to abate the private nuisance.

113.   As a result of the private nuisance, Plaintiff has incurred, and will continue to incur costs and damages, such as investigation, cleanup, remediation, or removal costs related to PFAS contamination.

## COUNT SIX – PUBLIC NUISANCE
## AGAINST ALL DEFENDANTS

114.   Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1-79 of this Complaint as if they were set forth fully herein.

115.   Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean

environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

116.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to the use of waters that serve as a source of potable water, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

117.    The public nuisance created by Defendants is continuing.

118.    Defendants have failed, and continue to fail, to abate the public nuisance.

119.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer, harm and damages special to Plaintiff and different in kind from those the general public may have suffered, such as investigation, cleanup, remediation, or removal costs related to PFAS contamination, such that Defendants should be required by injunction to abate the nuisance they have created.

### COUNT SEVEN – FRAUDULENT CONVEYANCE
### VIOLATION OF ILLINOIS' UNIFORM FRAUDULENT TRANSFER ACT
### ("ILUFTA")
### AGAINST THE DUPONT DEFENDANTS

120.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-79 as if fully stated herein.

121.    Plaintiff seeks all relief available under the ILUFTA for the Dupont Defendants'
violations of the ILUFTA for their fraudulent conveyances as part of their various spin-off
transactions.[3]

122.     Pursuant to the ILUFTA:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
whose claim arose before the transfer was made or the obligation was incurred if the
debtor made the transfer or incurred the obligation without receiving a reasonably
equivalent value in exchange for the transfer or obligation and the debtor was
insolvent at that time or the debtor became insolvent as a result of the transfer or
obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose
before the transfer was made if the transfer was made to an insider for an
antecedent debt, the debtor was insolvent at that time, and the insider had reasonable
cause to believe that the debtor was insolvent.

740 ILCS 160/6.

123.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer
DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or
collect a judgment which they are or will be owed. As a result of the DuPont Defendants' acts,
omissions, and other conduct described herein, Plaintiff has been damaged.

124.    At all relevant times, the DuPont Defendants have (1) acted with actual intent to
hinder, delay, and defraud parties; (2) acted without receiving a reasonably equivalent value in
exchange for the transfer obligation arising out of the DuPont-Chemours spinoff; and/or (3) were
engaged or were about to engage in a business for which the remaining assets of Chemours  were
unreasonably small in relation to the business or that the business intended to incur, or those

---

[3] As previously defined, the "DuPont Defendants" refers to all DuPont entities named herein, including Defendant
Corteva, and all Chemours entities named herein.

liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

125.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS for use in AFFF and/or AFFF containing PFAS with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would impact groundwater, Plaintiff's water supplies, and other natural resources.

126.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS for use in AFFF.

127.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

128.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

129.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay. Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it under

ILUPTA, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Illinois American Water ("ILAW") respectfully requests that this Court:

a. Enter judgment finding Defendants jointly and severally liable for all costs and damages incurred by Plaintiff, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination; including the reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

b. Enter judgment finding Defendants jointly and severally liable for cleanup and/or removal costs and damages, including but not limited to prior, interim and future capital as well as operation and maintenance costs, including the reasonable costs of assessing injury, destruction or loss resulting from the discharges, and threatened discharges;

c. Enter judgment finding Defendants liable for punitive damages;

d. Enter judgment finding Defendants liable for consequential damages;

e. Enter judgment requiring, via injunction, Defendants to abate the nuisance they have created;

f. Award Plaintiff costs and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

g. Award Plaintiff such other relief as this Court deems appropriate.

26

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

Attorneys for the Plaintiff

By:
    /s/ Christiaan A. Marcum
    Christiaan A. Marcum
    RICHARDSON, PATRICK,
    WESTBROOK, & BRICKMAN LLC
    1037 Chuck Dawley Blvd., Bldg. A
    Mount Pleasant, SC 29464
    (843) 727-6642
    cmarcum@rpwb.com

    T. Roe Frazer II
    **FRAZER PLC**
    30 Burton Hills Boulevard, Suite 450
    Nashville, Tennessee 37215
    (615) 647-0990
    roe@frazer.law

Dated: May 12, 2020